IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARCUS ORTIZ | CRIMINAL ACTION<br><br>NO. 23-506-KSM |

**MEMORANDUM**

**MARSTON, J.**                                                                                                    **February 8, 2024**

Defendant Marcus Ortiz was indicted by a grand jury on a single count of violating 18 U.S.C. § 922(g)(1), which forbids any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] . . . any firearm or ammunition." (Doc. No. 1.)  Before the Court is Ortiz's motion to dismiss the indictment in which he argues that the Third Circuit's recent *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) renders § 922(g)(1) unconstitutional as applied to him.  (Doc. No. 14.)  Ortiz's arguments are without merit, and the Court denies the motion.

**I.      Factual Background**

Ortiz is certainly no stranger to the criminal justice system.  Indeed, over the past twenty years, Ortiz has fifteen adult state court convictions, including numerous felonies and misdemeanors that are punishable by at least one year of imprisonment.  (Doc. No. 15 at 3.)  Ortiz's extensive rap sheet consists of the following:

- On July 16, 2003, Ortiz was convicted of purchasing and receiving controlled substances and intentionally possessing a controlled substance.  He was sentenced to one year of probation for each of these offenses.  (*Id.*)

- On November 18, 2003, Ortiz was convicted of unauthorized use of a motor vehicle and resisting arrest.  He received 18 months of probation.  (*Id.*)

1

- On January 27, 2005, stemming from an April 12, 2001 arrest, Ortiz was convicted of manufacturing, delivery, or possession with intent to deliver controlled substances. He was sentenced to 11½ - 23 months' imprisonment followed by one year of probation. (*Id.*)

- On April 5, 2010, Ortiz was convicted of possession of an instrument of a crime and simple assault. For these offenses, he was sentenced to time served of 23 months' imprisonment and two years of probation. (*Id.*)

- On April 4, 2011, stemming from an October 22, 2009 arrest, Ortiz was convicted of possession of an instrument of a crime and simple assault. He was sentenced to two years of probation.

- Also on April 4, 2011, stemming from a May 25, 2010 arrest, Ortiz was convicted of criminal conspiracy engaging – simple assault and simple assault. For these offenses, he was sentenced to one year of probation. (*Id.*)

- On April 27, 2011, Ortiz was convicted of possession of contraband as an inmate. He received a sentence of 1-2 years' imprisonment followed by two years of probation. (*Id.*)

- On October 24, 2017, Ortiz was convicted of manufacturing, delivery or possession with intent to deliver, conspiracy, and unlawful possession of a firearm. Ortiz was sentenced to 3-6 years' imprisonment. (*Id.*)

That brings us to the indictment at issue. According to the Government, on the evening of September 13, 2023, less than a year after terminating parole for his 2017 conviction (*id.* at 4), Ortiz was seen by officers from their vehicle nervously attempting to conceal the right front side of his waistband. (*Id.* at 1.) Concerned that he might be concealing a firearm, the officers made contact with Ortiz as he was walking with two other individuals. (*Id.* at 2.) However, as soon as one of the officers opened their door, Ortiz began running. (*Id.*) As Ortiz was fleeing, officers observed him remove what appeared to be a firearm from his waistband and throw it onto the roof of a set of garages. (*Id.*) Officers eventually detained Ortiz and retrieved from the roof a green and black Smith & Wesson "M&P 40" semi-automatic .40 caliber handgun, loaded with 15 live rounds in the magazine and one in the chamber. (*Id.*) A search revealed that the firearm was reported stolen out of Atlanta, Georgia. (*Id.*)

On December 5, 2023, Ortiz was indicted by a federal grand jury. (Doc. No. 1.) The indictment read in relevant part that, despite having "been convicted in a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year," Ortiz "knowingly possessed a firearm, that is, a Smith & Wesson, M&P 40, .40 caliber semi-automatic pistol . . . loaded with 16 live rounds of .40 caliber ammunition" in violation of 18 U.S.C. § 922(g)(1). (*Id.*)

## II.  Applicable Law: The *Bruen* and *Range* Decisions

Ortiz moves to dismiss his indictment, arguing that § 922(g)(1) violates his Second Amendment right to bear arms. The Second Amendment provides, in relevant part, that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This right, however, is "not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). Indeed, as the Supreme Court outlined in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Instead, on multiple occasions, the Supreme Court has outlined that the Second Amendment allows for a "variety" of firearm regulations, including the "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 636; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' . . . . We repeat those assurances here.") (citation omitted).

The Supreme Court revisited the Second Amendment recently in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). In *Bruen*, the Supreme Court held unconstitutional a New York statute requiring individuals to show that "proper cause" existed

3

before they would be provided an unrestricted license to carry a firearm outside of their home. *Id.* at 11–12, 70.  In so deciding, the Court clarified the standard by which courts are to analyze whether a firearm regulation is consistent with the Second Amendment.  Prior to *Bruen*, the Courts of Appeals "coalesced" around a "two-step" test that combined history with means-end scrutiny. *Id.* at 17.  Under this test, a firearms regulation was constitutional so long as the government showed either 1) that the conduct regulated was beyond the scope of the Second Amendment right as originally understood or 2) passed either intermediate or strict scrutiny, with the appropriate standard determined by whether the regulation burdened a "core" Second Amendment right. *Id.* at 18–19.  The Supreme Court held that this approach was "one step too many." *Id.* at 19.  Rejecting the means-end approach, the Court held that for a firearm regulation to be constitutional, the "government must affirmatively prove" that it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*  In other words, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26.

       The Court noted that in some situations such an analysis "will be fairly straightforward," and that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*  However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27.  In such situations, courts are instructed to "reason[ ] by analogy" and find that a "historical regulation is a proper analogue for a distinctly modern firearm regulation" only where "the two regulations are 'relevantly similar.'" *Id.* at 28–29.  To determine whether regulations are sufficiently similar

under the Second Amendment, the Court pointed to two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. Put another way, the "'central' considerations" when conducting this analogical reasoning are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The Court clarified that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphasis in original).

Given that the challenge in *Bruen* did not implicate § 922(g)(1), the majority opinion had no occasion to address the constitutionality of the statute. Nevertheless, six Justices (Roberts, Alito, Kavanaugh, Breyer, Sotomayor, and Kagan), through concurring and dissenting opinions, signaled their understanding that the majority opinion in *Bruen* did not call into question the constitutionality of § 922(g)(1). *See id.* at 72 (Alito, J., concurring) (noting that the decision does not "disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the carrying of guns"); *see also id.* at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (emphasizing that "the Second Amendment allows a 'variety' of gun regulations," and that *Bruen* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons" (citation omitted)); *id.* at 129 (Breyer, J., dissenting, joined by Sotomayor, and Kagan, JJ.) (explaining that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" that addressed presumptively lawful firearm restrictions, including the prohibition on the possession of a firearm by a felon).

5

Shortly after *Bruen*, the Third Circuit issued its *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), which Ortiz now seeks to invoke. *Range* was a civil action brought by Bryan Range who sought a declaration that 18 U.S.C. § 922(g)(1) violated the Second Amendment only as applied to him, and an injunction prohibiting the law's enforcement against him. *Id.* at 98–99. Twenty-eight years prior, Range had pled guilty to one count of making a false statement to obtain food stamps, in violation of 62 Pa. Cons. Stat. § 481(a). *Id.* at 98. In short, Range misrepresented how much money he earned when filling out a food stamp application at a time when he was supporting his wife and three children on $300 per week of income. *Id.* This conviction, although classified as a misdemeanor, was punishable by up to five years' imprisonment and thus Range was precluded from possessing a firearm under § 922(g)(1). *Id.* Range, however, desired a rifle and potentially a shotgun for hunting and self-defense. *Id.* at 99.

The district court granted summary judgment to the Government, "faithfully applying" the then-controlling two-step analysis. *Id.* Range appealed and while his appeal was pending, the Supreme Court's opinion in *Bruen* was issued. *Id.* The Third Circuit panel permitted briefing on *Bruen*'s impact, but nevertheless affirmed the dismissal of Range's complaint, finding that the Government had "met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction 'places him outside the class of people traditionally entitled to Second Amendment rights.'" *Id.* (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022)). The Third Circuit granted Range's petition for rehearing *en banc*. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023).

The Third Circuit's *en banc* opinion reversed the panel, holding that § 922(g)(1) was unconstitutional as applied to Range. *Range*, 69 F.4th at 98. The court interpreted *Bruen*'s historical framework as requiring two steps:

> After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Id.* at 101 (quoting *Bruen*, 597 U.S. at 19) (citations omitted). The court answered the first question in the affirmative, rejecting the Government's argument that the Second Amendment only covers "law-abiding, responsible citizens" and instead holding that Range, like all Americans, was one of "the people" guaranteed Second Amendment rights. *Id.* at 101–03. The court found the question of whether the Second Amendment covered Range's conduct to be an "easy question," holding that his request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right. *Id.* at 103.

Turning to the second step of the *Bruen* analysis, the court held that the Government had failed to meet its burden of demonstrating that the restriction set forth in § 922(g)(1), as applied to Range, was "consistent with the Nation's historical tradition of firearm regulation." *Id.* The court found the Government's reliance on language in *Heller* describing § 922(g)(1)'s prohibition as "longstanding" insufficient and held that the Government's invoked historical analogues were inapt. *Id.* at 103–06.

Since the Government failed to carry its burden under the newly established *Bruen* framework, the court reversed the panel's prior decision. *Id.* at 106. But the court stressed that its holding was "a narrow one." *Id.* The majority emphasized that the Government had failed to show that "our Republic has a longstanding history and tradition of depriving *people like Range*

7

of their firearms" and thus § 922(g)(1) was unconstitutional *as applied* to Range. *Id.* (emphasis added). Indeed, as made clear by Judge Ambro's concurrence, the majority's opinion did not "spell doom for § 922(g)(1)" or limit Congress's ability to disarm those "who pose a threat to the orderly functioning of society." *Id.* at 109, 113 (Ambro, J., concurring); *see also United States v. Blackshear*, No. CR 23-159, 2023 WL 5985284, at *2 (E.D. Pa. Sept. 14, 2023) (noting that "*Range*'s holding was narrow and limited to the facts of that case, particularly the nature of Bryan Range's previous conviction"). Instead, § 922(g)(1) remains "presumptively lawful." *Range*, 69 F.4th at 109–10 (Ambro, J., concurring) (quoting *Bruen*, 597 U.S. 81).

### III. Section 922(g)(1) is Constitutional as Applied to Ortiz, A Violent Felon.

In his terse motion, Ortiz argues that applying *Range*, § 922(g)(1) is unconstitutional as applied to him. (Doc. No. 14 at 5.) Applying the two-step *Bruen* analysis, the Court must first "decide whether the text of the Second Amendment applies to [Ortiz] and his proposed conduct." *Range*, 69 F.4th at 101. If so, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

At the first step, the Government correctly concedes that under *Range*, Ortiz is among "the people" covered by the Second Amendment despite his prior felony convictions. (Doc. No. 15 at 8); *see Range*, 69 F.4th at 101–03 (holding that all citizens fall within the purview of the Second Amendment, not just those who are "law-abiding"). However, the Government argues that Ortiz's *conduct* is not covered by the Second Amendment. (Doc. No. 15 at 8–11.) In *Range*, the Third Circuit gave this portion of the analysis short shrift, deeming it an "easy question" and finding that Range's request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right. *Range*, 69 F.4th at 103. Here, the Government

argues that two facts complicate the analysis: 1) Unlike in *Range*, Ortiz has not shown that he possessed the firearm for a lawful purpose; and 2) the firearm Ortiz possessed was stolen. (Doc. No. 15 at 8–11.) These arguments have some force. *See United States v. Jenkins*, No. CR 23-088, 2023 WL 6534200, at *6 (E.D. Pa. Oct. 6, 2023) ("[W]here a Section 922(g)(1) defendant cannot prove by a preponderance of the evidence that he was carrying a firearm for the purpose of self-defense—or other conduct expressly covered by the Second Amendment, such as hunting—the right to bear arms does not protect the defendant, and the indictment survives an as-applied challenge."). But because the Court finds below that the Government has met its burden at the second step, it need not address these issues and will assume that the Second Amendment covers Ortiz's conduct without so deciding.[1]

Turning to the second step of the *Bruen* analysis, the Court must determine whether the Government has shown that § 922(g)(1) as applied to Ortiz "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. As previously discussed, the Supreme Court in *Bruen* provided that this historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original).[2] In identifying a historical analogue, the Court in *Bruen* warned that "not all history is created equal." *Id.* at 34. "In considering [historical] precedent . . . we discount 'historical evidence that long predates' 1791 and 'guard against giving postenactment history more weight

---

[1] The Government also argues that *Range* was wrongly decided. (Doc. No. 15 at 4–5.) Because the Court is bound by Third Circuit precedent and the Government makes clear that it includes this argument solely for preservation purposes, the Court will not address it. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

[2] This remains true regardless of whether the Government is required to demonstrate that there exists "distinctly similar" or "relevantly similar" historical analogues. *Jenkins*, 2023 WL 6534200, at *3.

than it can rightly bear.'"  *Lara v. Comm'r Pennsylvania State Police*, 2024 U.S. App. LEXIS 1159, at *7 (3d Cir. Jan. 28, 2024) (alterations adopted) (quoting *Bruen*, 597 U.S. at 34–35). However, because the Second Amendment codified a "pre-existing right," "English history dating from the late 1600s, along with American colonial views leading up to the founding" are relevant to identifying the scope of the right.  *Range*, 69 F.4th at 106 (Krause, J., dissenting) (quoting *Bruen*, 597 U.S. at 20).

As an initial matter, the Court rejects Ortiz's argument that *Range* dictates the dismissal of his indictment.  (Doc. No. 14 at 5.)  While it is true that in *Range* the Third Circuit held that the Government failed to establish "a longstanding history and tradition of depriving people *like Range* of their firearms," Ortiz is demonstrably not "like Range."  *Range*, 69 F.4th at 106 (emphasis added).  The most significant distinguishing fact is that Ortiz's prior convictions place him in a group of individuals who have "demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."  *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).  Most notably, Ortiz has been convicted of multiple drug trafficking offenses, with the most recent conviction occurring in 2017.  (Doc. No. 15 at 3.)  As numerous other courts have recognized, guns and drugs are a "dangerous combination," and drug-traffickers are "dangerous and disruptive to society."  *See United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *8 (M.D. Pa. Sept. 11, 2023) (quoting *Muscarello v. United States*, 524 U.S. 125, 132 (1998)); *Blackshear*, 2023 WL 5985284, at *3 (noting that "[d]rugs and guns are a 'dangerous combination'" and that the defendants prior drug trafficking convictions suggested that he posed "a danger to society"); *United States v. Mosqueda*, No. CR 16-233, 2017 WL 5157847, at *4 (W.D. Pa. Nov. 7, 2017) ("The combination of drugs and guns constitutes a very serious danger to the community.").  Ortiz has also been convicted numerous

times of the inherently violent crime of assault. (Doc. No. 15 at 3); *see United States v. Adams*, No. 3:23CR122, 2024 WL 54112, at *10 (M.D. Pa. Jan. 4, 2024) (finding that simple assault was a violent crime and that historical examples of disarming violent individuals supported finding that § 922(g)(1) was constitutional). And finally, Ortiz was recently convicted of illegal possession of a firearm (Doc. No. 15 at 3), which "demonstrates, at the very least, that he has a history of disobeying firearm regulations specifically designed to protect public safety." *United States v. Cotton*, No. CR 22-471, 2023 WL 6465836, at *4 (E.D. Pa. Oct. 4, 2023) (holding that § 922(g)(1) was constitutional as applied to individual who had previously been convicted of unlawful possession of a firearm); *cf. United States v. Allen*, 2023 WL 8701295, at *3-5 (E.D. Pa. Dec. 15, 2023) (holding that § 922(g)(1) is constitutional as applied to person previously convicted of possessing a firearm in a car without a concealed carry permit, 18 Pa. Cons. Stat. § 6106). Thus, the Court finds that Ortiz's extensive criminal record, which includes numerous violent felonies, is a far cry from Range's singular, twenty-eight-year-old misdemeanor conviction for making a false statement on a food stamps application to help his struggling family. The Government's failure to carry its burden with respect to non-violent individuals like Range suggests little about its ability to do so here where a dangerous felon is at issue. *See United States v. O'Connor*, No. CR 03-134, 2023 WL 5542087, at *3 (W.D. Pa. Aug. 29, 2023) (suggesting that in *Range*, the Third Circuit held that the government had failed to meet its burden "in light of [Range's] non-violent conviction"). Indeed, along with suggesting that its holding was "narrow," the court in *Range* specifically stated that it was not deciding the issue of whether § 922(g)(1) is constitutional as applied to dangerous felons. *Range*, 69 F.4th at 104 n.9; *see also Jenkins*, 2023 WL 6534200, at *13 (noting that "*Range* did not dispute the strength or

validity of th[e] historical record" of disarming dangerous individuals but rather "just found that record inapplicable in the case before it").

Rather than relying solely on the Third Circuit's analysis in *Range*, this Court must independently determine whether the Government has presented a sufficient historical basis for disarming dangerous felons like Ortiz. The Court finds that the Government has met this burden. Turning first to the pre-founding era, the Government has put forth evidence that individuals who posed a potential danger to others were frequently disarmed. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."). Such restrictions date back to England, from whom we "inherited" our right to bear arms. *Heller*, 554 U.S. at 599. For example, a 17th century English statute allowed the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13.

Numerous colonies and states followed their English predecessors in disarming those who they deemed dangerous either because of their violent acts or their disloyalty. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others. Violence was one ground for fearing danger, as were disloyalty and rebellion."); *United States v. Jackson*, 69 F.4th 495, 502–04 (8th Cir. 2023) (collecting instances in which colonial American legislatures permitted the disarmament of individuals); *cf. Range*, 69 F.4th at 120–28 (Krause, J., dissenting) (providing a thorough examination of legislation and statutes that existed from the time of the English Restoration to the ratification of the U.S. Constitution that disarmed former felons). For

12

example, a colonial New Hampshire statute permitted "affrayers, rioters, disturbers or breakers of the peace" to have their "arms or weapons" taken away.  Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15; *see also* Act for the Punishment of Criminal Offenders, 1692-93, ch. 18, § 6 *reprinted in* 1 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (providing the same).  Similarly, in March of 1776, the Continental Congress recommended that states disarm individuals who were "notoriously disaffected to the cause of America" or who "refuse[d] to associate, to defend, by arms the United American Colonies, against the hostile attempts of the British fleets and armies."  4 Journals of the Continental Congress 1774–1789, at 205 (1906).  Massachusetts acted on this advice, shortly thereafter passing a law permitting the disarmament of individuals who refused to declare loyalty to the United States.  Act of May 1, 1776, ch. 21, § 1, *reprinted in* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886).  Numerous other states, such as Pennsylvania, North Carolina, and Virginia, followed suit and passed similar laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States.  *See* Act of June 13, 1777, ch. 756, §§ 2–4, *reprinted in* 9 The Statutes at Large of Pennsylvania from 1682–1801 at 110–13 (William Stanley Ray ed., 1903); *Reichenbach*, 2023 WL 5916467, at *7 (citing 24 The State Records of North Carolina 89 (Walter Clark ed. 1905); 9 William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 282 (1821)).  And an early New Jersey statute allowed the government to disarm any individual that it judged "disaffected and dangerous to the present Government."  Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90.

As the Government argues, precursors to the Second Amendment further support the assertion that the founding generation permitted the disarmament of dangerous individuals.

13

During the Pennsylvania ratifying convention, a "highly influential" minority proposal, *Heller*, 554 U.S. at 604, stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or *real danger of public injury from individuals*." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (quoting The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787) (emphasis added). Similarly, a proposal at the Massachusetts constitutional ratifying convention provided that Congress may not "prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Id.* at 681 (emphasis added).

This disarmament of individuals who were deemed dangerous continued post-ratification and through the Reconstruction era.[3] For example, a federal Reconstruction order applicable to South Carolina provided that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866). Further, as discussed in Judge Ambro's concurrence in *Range*, numerous states disarmed "tramps" whereas other states prohibited individuals who were "not engaged in any legitimate business" or had "ever borne arms against the government of the United States" from possessing a firearm. *Range*, 69 F.4th at 112 (quoting 2 General Statutes of the State of Kansas 353 (1897)).

Utilizing the "why" and "how" metrics set forth by the Supreme Court in *Bruen*, it is clear that these statutes present apt analogues to § 922(g)(1)'s restrictions on Ortiz's Second Amendment right to bear arms. Turning first to the "why" metric, while these various historical

---

[3] The Third Circuit has recently clarified that the "Second Amendment should be understood according to its public meaning in 1791" as opposed to its understanding at the time the Fourteenth Amendment was ratified. *Lara*, 2024 U.S. App. LEXIS 1159, at *17. Nevertheless, the Court in *Bruen* found that evidence from the Reconstruction era was relevant at the very least as "confirmation of what the Court thought had already been established" through older laws. *Bruen,* 597 U.S. at 37. Thus, while the Court places more weight on the historical analogues from around the founding era, we will consider evidence from the Reconstruction era for this same confirmatory purpose.

statutes have somewhat different language, targets, and impact, the common thread is that they were all efforts to disarm groups that "lawmakers deemed dangerous and disruptive to society" in an attempt to protect "the public from violence and disorder." *Reichenbach*, 2023 WL 5916467, at *7. Here too, disarming individuals like Ortiz, who have shown a proclivity toward violence and an inability to safely hold firearms, serves the purpose of protecting the public from unnecessary danger and disruption. Similarly, the "how" metric suggests that these statutes are closely aligned: both these historical statutes and § 922(g)(1) reflect a decision from lawmakers that disarming dangerous individuals was an appropriate means to ensure public safety. Accordingly, § 922(g)(1), as applied to Ortiz, is sufficiently analogous to the historical practices of firearm regulation, and the Government has met its burden under *Range* and *Bruen.*

In sum, Ortiz asks this Court to disregard the Third Circuit's warning that *Range* was a "narrow" opinion and instead read it to permit even those individuals who have demonstrated a proclivity toward violence and drug trafficking an unwavering right to bear arms. This the Court cannot do. Instead, given the scads of historical examples of lawmakers disarming those who they believed posed a potential danger to society, "this Court heeds—as it must—the wisdom of our Nation's founding generation, which demonstrated through early American legislation that the right to bear arms must by necessity yield to the need to safeguard the Country's citizens." *Reichenbach*, 2023 WL 5916467, at *10. In holding that § 922(g)(1) is constitutional as applied to individuals like Ortiz, the Court is in accord with nearly every post-*Range* decision in this Circuit.[4]

---

[4] *See, e.g.*, *Blackshear*, 2023 WL 5985284 (Pappert, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with multiple felony drug and firearm convictions based on *Heller* and the history of disarming dangerous individuals); *United States v. Ames*, No. 23-178, 2023 WL 5538073 (E.D. Pa. Aug. 28, 2023) (Kenney, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony robbery and firearm convictions based on *Heller*'s "presumptively lawful" holding and

\* \* \*

Since none of Ortiz's arguments have merit,[5] the Court denies his motion to dismiss his indictment. An appropriate order will follow.

---

historical analogues); *United States v. Minter*, No. 22-155, 2023 WL 6051265 (M.D. Pa. Sept. 15, 2023) (Mariani, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on *Heller* and historical statutes disarming individuals "deemed dangerous, untrustworthy, or unlikely to abide by the law"); *Reichenbach*, 2023 WL 5916467 (Brann, C.J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on historical prohibitions which were sufficiently analogous to § 922(g)(1) prohibiting drug traffickers from possessing firearms); *United States v. Wise*, No. CR 21-511, 2023 WL 6260038 (W.D. Pa. Sept. 26, 2023) (Hardy, J.) (denying as-applied and facial challenges to § 922(g)(1) based on historical analogues which "disarmed individuals who were deemed to be dangerous, untrustworthy, or a threat to the orderly functioning of society"); *Cotton*, 2023 WL 6465836 (Pratter, J.) (denying as-applied challenge to § 922(g)(1) based on historical analogues disarming individuals who "posed a potential danger"); *United States v. Ladson*, No. CR 23-161-1, 2023 WL 6810095 (E.D. Pa. Oct. 16, 2023) (Baylson, J.) (denying as-applied challenge to § 922(g)(1) based on government identifying "numerous historical analogues establishing that the Second Amendment permits the disarmament of those who, like Defendant, are 'dangerous to the Peace'"); *United States v. Green*, No. CR 22-387, 2023 WL 6164407 (E.D. Pa. Sept. 21, 2023) (Diamond, J.) (rejecting facial and as-applied challenges to § 922(g)(1) based on *Heller* and historical analogues).

[5] Moreover, to the extent Ortiz intended to make a facial challenge to § 922(g)(1), such a challenge also fails. To succeed on a facial challenge, Ortiz "must establish that no set of circumstances exists under which [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011); *see also Blackshear*, 2023 WL 5985284, at \*3 (applying this principle in the context of a facial challenge to § 922(g)(1)). Since, as set forth above, Ortiz cannot show that § 922(g)(1) is unconstitutional even as applied to him, he is unable to carry his burden of showing that it is unconstitutional in all circumstances. *See Blackshear*, 2023 WL 5985284, at \*3 (rejecting facial challenge to § 922(g)(1) where the defendant failed to show that the statute "is unconstitutional as applied to his case, let alone in all circumstances.").